# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Criminal No. AW-10-0760 |
| ANDREW ISAAC CHANCE, | * | |
| Defendant | * | |

## MEMORANDUM OPINION

The Government has charged Defendant Chance with one count of filing a retaliatory lien, in violation of 18 U.S.C. § 1521, and three counts of filing a false claim, in violation of 18 U.S.C. § 287. Presently pending before the Court is the Government's Motion *in Limine* to Exclude Defendant's Noticed Expert Witness Testimony. On November 10, 2011 and November 15, 2011, the Court considered parties' arguments. For the reasons stated in open court and as clarified below, the Court **GRANTS** the Government's motion *in limine*. As previously indicated, the Court will monitor the evidence during trial, and as the trial progresses, if the Court finds expert testimony is needed, the Court will reconsider its ruling.

## BACKGROUND

**I.  Relevant Facts and Procedural History**

On April 22, 2011, Dr. Martin Brandes evaluated Defendant on the issue of competency to stand trial. Dr. Brandes generated two reports, dated April 28, 2011 and May 11, 2011. Following a May 13, 2011 Motions Hearing, the Court ordered an inpatient psychiatric evaluation to establish Defendant's competency to stand trial. Pursuant to this Order, Dr. William Ryan evaluated the Defendant on four instances—June 8, 2011; June 9, 2011; July 3,

2011; and July 10, 2011. Dr. Ryan submitted a report to the Court on July 13, 2011. During a July 28, 2011 Status Call, Defendant indicated they were not pursuing the issue of competency. Defendant was further evaluated by Dr. Richard Restak on October 25, 2011 and by Dr. Victoria Starbuck on October 27, 2011.

On October 24, 2011, approximately three weeks before trial, Defendant notified the Court of his intention to introduce five expert witnesses pursuant to Federal Rule of Criminal Procedure 12.2(b)—three medical experts, a forensic accountant, and a contracts and disputes attorney. On November 8, 2011, the Government filed a motion *in limine*, requesting the Court exclude all of Defendant's experts.

During a November 10, 2011 Motions Hearing, the Court considered parties' arguments. At this hearing, the Court received hard-copies of Dr. Restak and Dr. Starbuck's reports. The Government and Defendant both filed supplemental documents concerning these expert witnesses on November 13, 2011 and November 14, 2011 respectively. In addition to these last-minute supplements, Defendant filed another motion *in limine* and an Opposition to the Government's Intent to Introduce 404(b) Evidence on November 14, 2011—one day before trial was scheduled to begin on November 15, 2011. Due to this barrage of last-minute pleadings, however, the Court only conducted jury selection on November 15, 2011. After sending jurors home, the Court reviewed the additional documents and held a motions hearing to address these unresolved issues. Following additional oral argument, the Court granted the Government's Motion *in Limine* for the reasons stated in this opinion.

On November 16, 2011, at the conclusion of the first day of trial, Defendant asked the record from the day before be completed and perfected for purposes of appeal. Specifically, Defendant requested the Court allow Defendant's experts to testify in court absent the jury.

Upon the Court's denial of this request, Defendant moved to proffer written reports describing the content of the expert testimonies. The Court also denied this request, noting that Defendant's medical experts have already provided written reports to the Court. At this point, Defendant proceeded to reiterate the same arguments that co-counsel had articulated the day before. The Court emphasized that it had already evaluated both parties' arguments and ruled on the issue of expert testimony.

The Court characterized Defendant's requests as nothing more than an attempt to "take a second bite of the apple." It appears to the Court that Defendant—recognizing his submissions and arguments are insufficient to support admittance of expert testimony—is simply trying to bolster the record. The Court noted that allowing the Defendant to proffer live testimony or additional written reports severely prejudices the Government, especially at this point in the trial. Not only would the Government have little time to find and prepare its own expert witnesses, but Defendant has had the advantage of hearing the Government present its case-in-chief and the majority of its evidence against Defendant.

## II. Summary of Medical Experts' Reports

Defendant intended to introduce three medical experts, who would have testified to a mental disease or defect of Defendant's that bears on the issue of guilt: (1) Dr. Brandes, a forensic psychiatrist; (2) Dr. Restak, a neurologist and neuropsychiatrist; and (3) Dr. Starbuck, a neuropsychologist.

### A. Dr. Martin J. Brandes, Forensic Psychiatrist

Both of Dr. Brandes's evaluations concerned Defendant's competency to stand trial. He concluded that he was unable to form a definite opinion as to whether the Defendant is

competent to stand trial, but stated that there is "substantial reason" to be concerned about Defendant's competency. Therefore, Dr. Brandes recommended an inpatient forensic psychiatric evaluation for Defendant, which was conducted by Dr. Ryan on July 13, 2011.

### 1. Brandes's First Report – April 28, 2011 (Doc. 37-1)

Dr. Brandes's first report is based solely on Defendant's own descriptions of his personal, psychiatric, and medical history; as well as Dr. Brandes's observations of Defendant during the interview. Dr. Brandes deferred diagnosis of major mental illness, but ruled out personality change secondary to medical illness. Dr. Brandes also deferred diagnosis regarding any personality disorders, mental retardation, and learning disabilities.

Nonetheless, Dr. Brandes expressed "substantial reason to be concerned" about Defendant's competency to stand trial, due to Defendant's "abnormal lack of concern regarding the consequences of conviction, inability to reasonably appreciate the strength of the Government's case, distorted understanding of why the alleged events are considered crimes . . . [and Defendant's] grossly inflated over estimation of the likelihood of a successful defense." At the conclusion of this initial report, Dr. Brandes recommended an inpatient forensic psychiatric evaluation.

### 2. Brandes's Second Report – May 11, 2011 (Doc. 56-1)

After subsequently reviewing two psychiatric records—a September 17, 2007 presentence forensic psychiatric evaluation and a July 16, 2009 Mental Health and Substance Abuse Evaluation—Dr. Brandes supplemented his initial report, stating that the earlier records supported his earlier concerns regarding Defendant's cognitive impairments. In particular, Dr. Brandes referenced the 2007 evaluation, where Dr. Neil Blumberg diagnosed Defendant with

Cognitive Disorder Not Otherwise Specified. Dr. Brandes opined that Defendant's cognitive deficits have likely worsened since 2007. However, since his reports concerned Defendant's current level of competency, Dr. Brandes once again recommended an inpatient evaluation focused on Defendant's competency to stand trial in the present and foreseeable future.

### B. Dr. Victoria N. Starbuck, Neuropsychologist – November 8, 2011

Dr. Starbuck's report was based on prior records and a psychological evaluation conducted on October 27, 2011. The psychological evaluation included several tests to determine Defendant's present level of cognitive and emotional functioning.

Dr. Starbuck summarized the cognitive test results as suggesting "Average to Low Average general intellectual functioning." However, Dr. Starbuck noted that Defendant's impaired performance on the Tactual Performance Test (TPT) was particularly unusual. Based on Defendant's performance on the TPT and the Beck Cognitive Insight Scale, Dr. Starbuck concluded that Defendant exhibited an unusual level of "mental inflexibility and cognitive rigidity," a "lack of flexibility and rigid personality style," and an "unwillingness to accept alternative explanations."

### C. Dr. Richard Restak; Neurologist, Neuropsychiatrist – November 7, 2011

Dr. Restak conducted a neurological and neuropsychiatric evaluation on October 25, 2011, following a review of Defendant's psychiatric and institutional medical records. Dr. Restak did not identify any neurological problems other than testing challenges related to Defendant's impaired vision. Dr. Restak did, however, support Dr. Starbuck's findings of a rigid and inflexible type of personality. Dr. Restak also opined that Defendant's "degree of certainty in the righteousness of his behavior" was consistent with a Delusional Disorder, which does not

necessarily conflict with Dr. Starbucks diagnosis. Dr. Restak suggested that a further psychiatric consultant should revisit whether Defendant may be suffering from a delusion.

## LEGAL ANALYSIS

Federal Rules of Evidence 702 and 704 govern the admissibility of expert testimony, and the Court serves as a gatekeeper in determining whether to admit expert testimony. *See United States v. Forrest*, 429 F.2d 73, 80 (4th Cir. 2005). The Court has "broad discretion" to decide whether to admit expert testimony and "will not be reversed absent a clear abuse of discretion." *United States v. Barsanti*, 943 F.2d 428, 432 (4th Cir. 1991).

Under Rule 702, expert testimony is appropriate if a witness's

> [S]cientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness, qualified as an expert . . . may testify thereto in the form of an opinion or otherwise . . .

Fed. R. Evid. 702. In short, the Court must consider "whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702 advisory committee's note. Furthermore, if an expert is permitted to testify, the expert may not speculate as to a defendant's state of mind. Fed. R. Evid. 704(b); *United States v. Fowler*, 932 F.3d 306, 315 (4th Cir. 1991).

In addition to the limits established by Rules 702 and 704, expert testimony is subject to the limitations of Federal Rules of Evidence 402 and 403. Rule 402 requires all evidence be relevant, and Rule 403 permits the exclusive of relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 402; Fed. R. Evid. 403.

## I. Mr. Jeff Barsky, Forensic Accountant
## Mr. J. Kimon Yiasamides, Contracts and Disputes Attorney

In Defendant's notice to the Court, he indicated plans to introduce Jeff Barsky, a forensic accountant, in order to testify as to: (1) the purpose and process of creating a trust; (2) the proper filing of 1041 tax returns; and (3) his evaluation of Defendant's filed tax returns. Defendant also sought to introduce Mr. Yiasamides, an attorney in the construction industry, in order to discuss the use of bonds and liens in both this case and commercial disputes.

Defendant argues that Mr. Barsky and Mr. Yiasamides's testimonies will aid jurors in understanding concepts that are likely unfamiliar to many jurors. Moreover, Defendant contends that Mr. Barsky and Mr. Yiasamides will provide information regarding Defendant's state of mind at the time of the alleged offenses.

First, the Court finds Mr. Barsky and Mr. Yiasamides's expertise unnecessary considering the relatively simple concepts at issue in this case. Here, Defendant is charged with filing a false retaliatory lien and filling income tax returns based on fictitious numbers. A forensic accountant is not necessary to explain made-up numbers on a tax return. Similarly, Mr. Yiasamides's testimony regarding the use of bonds and liens—especially in commercial disputes—is unhelpful in determining whether Defendant filed a false lien against a prosecutor. Moreover, the evidence presented during the first day of trial corroborated the Court's conclusion that jurors will not need specialized knowledge to understand the false lien and false claims at issue.

Second, it is unclear to what extent, if any, Mr. Barsky and Mr. Yiasamides can opine as to the Defendant's state of mind at the time of the alleged offenses. Defendant has not provided the Court with reports from either expert. Furthermore, there is no indication that Defendant

7

relied on advice from either Mr. Barsky or Mr. Yiasamides when filing the tax returns and lien. In fact, Mr. Yiasamides has never met with or spoken to the Defendant. In short, both testimonies are irrelevant and do not illuminate what the Defendant knew or intended when he submitted these documents.

At present, expert testimony would likely only confuse or mislead jurors. Again, if it becomes evident during trial that jurors require specialized knowledge to understand the evidence or to determine a fact in issue, the Court will reconsider its ruling.

## II. Medical Experts

According to the Defendant, the noticed medical experts are relevant and highly probative on the issue of whether the Defendant could have formed the requisite *mens rea* at the time of the alleged offenses. Specifically, Defendant maintains that the medical experts will bolster Defendant's contention that he had a good faith belief that he was acting in accordance with the law. As such, Defendant claims these testimonies will negate proof of *mens rea*, namely that the Defendant knowingly and intentionally committed the charged offenses.

### A. No Diagnosis of a Recognized Mental Disorder

None of Defendant's noticed experts diagnosed him with a mental disorder recognized by the DSM IV. Defendant emphasizes a 2007 diagnosis of Cognitive Disorder Not Otherwise Specified ("Cognitive Disorder NOS") (DSM-IV-TR: 294.9) by Dr. Neil Blumberg. *See* Doc. No. 47-1 at 11. Yet, Defendant did not plan to introduce Dr. Blumberg as an expert witness. Instead, Defendant argues that his noticed medical experts confirmed Dr. Blumberg's diagnosis of Cognitive Disorder NOS.

First, none of Defendant's medical experts explicitly confirmed Dr. Blumberg's diagnosis. Second, closer review of the reports indicates that such a claim mischaracterizes the substance of the reports. Dr. Brandes stated that "[his] concerns about possible cognitive impairments are supported by Dr. Blumberg's report . . . ." Doc. 56-1 at 2. This is not a confirmation of Dr. Blumberg's diagnosis. In fact, Dr. Brandes explicitly deferred his diagnosis of Defendant. See Doc. No. 37-1 at 4. Similarly, Dr. Starbuck simply stated that her findings are "in agreement with those offered by Dr. Martin J. Brandes in his report of 05/11/2011." Report from Dr. Starbuck (Oct. 27, 2011) at 6. Not only did Dr. Starbuck's report make no mention of Dr. Blumberg or Cognitive Disorder NOS, Dr. Starbuck's observation that her findings are consistent with Dr. Brandes's findings is no indication of any diagnosis on Dr. Starbuck's part. Moreover, contrary to Defendant's contention, Doc. No. 110 at 3, Dr. Starbuck did not state that the goal of her evaluation was to "identify the severity and detail of diagnosed Cognitive Disorder Not Otherwise Specified . . . ." *See* Report from Dr. Starbuck at 2 ("The current evaluation was requested to examine Mr. Chance's present level of cognitive and emotional functioning, and assist in planning his medical care.").

Dr. Restak's report also made no mention of Cognitive Disorder NOS. It is true Dr. Restak agreed with portions of Dr. Blumberg's report. Report from Dr. Restak (Nov. 7, 2011) at 1 ("I confirmed the information contained in Dr. Blumberg's 09/17/07 report regarding Past Psychiatric History, Past Medical History, Past Legal History and Personal History and will not repeat that information in this report."). However, at no point did Dr. Restak confirm Dr. Blumberg's diagnosis, which Dr. Blumberg discussed in a section titled "Assessment." Although Dr. Restak opined that the Defendant's behavior is consistent with a Delusional Disorder, Dr. Restak does not diagnose Defendant with a Delusional Disorder. *See id.* at 3.

9

Instead, Dr. Restak recommended a psychiatric consult to "revisit the issue of whether or not Mr. Chance may be suffering from a delusion." *Id.*

In short, instead of providing or confirming any recognized mental disorder, Defendant's medical experts emphasize Defendant's rigid and inflexible personality style, his mental inflexibility, his certainty in the righteousness of his behavior, and his unwillingness to consider alternative explanations  Such observations do not address whether Defendant knowingly and intentionally committed the charged offenses.

Furthermore, during the Motions Hearings, Defendant emphasized that his thought processes are distinguishable from the general population, that he does not think in the same way or at the same level as other people do. Yet, Dr. Starbuck concluded that Defendant's cognitive test results "suggest Average to Low Average general intellectual functioning," Report from Dr. Starbuck at 6, and Dr. Restak concluded that he "did not find much in the way of neurological or cognitive problems," Report from Dr. Restak at 3. Additionally, Dr. Brandes states that the Defendant does "not display marked deficits in behavior or judgment in everyday life activities . . . ." Doc. No. 56-1 at 3.

### B. No Opinion Regarding Defendant's Mental State at the Time of the Offenses

To satisfy the relevance requirement under Rule 402, Defendant's medical experts must opine on his state of mind *at the time of the offenses*. According to the Government, Defendant filed a retaliatory lien against the property of S.D. on August 14, 2009. He allegedly filed three false claims on September 7, 2010 and September 8, 2010. However, Defendant's noticed medical experts did not evaluate him until late April 2011 and late October 2011, six months to a year after the alleged offenses occurred.

Although Defendant asserts that the medical experts will testify as to his mental conditions and behaviors at the time of the offense, his Opposition provides no specifics. More importantly, the submitted expert reports do not explicitly comment on Defendant's state of mind at the time he allegedly committed the charged offenses. In fact, Dr. Brandes stated that his competency to stand trial evaluation "focuses on present time and foreseeable future, and is not retrospective." Doc. No. 56-1 at 2. Similarly, Dr. Starbuck stated that she was asked to examine Defendant's "*present* level of cognitive and emotional functioning, and assist in planning his medical care." Report from Dr. Starbuck (Oct. 27, 2011) at 2 (emphasis added). Moreover, Dr. Starbuck indicated that her test results accurately reflect Defendant's "*current* level of functioning." *Id.* (emphasis added).

It is true that Defendant's medical experts reviewed his previous medical evaluations, such as Dr. Blumberg's 2007 report. Only Dr. Brandes, however, speculated that "it is more likely that his cognitive deficits have worsened over the ensuing three and a half years . . . ." Doc. No. 56-1 at 3. Yet, Dr. Brandes did not offer explicit comments or conclusions regarding Defendant's state of mind at the time of the alleged offenses. Instead, Dr. Brandes articulated several *possible* physiological contributors to cognitive impairment. *See id.*

Defendant's other medical experts revealed that they had reviewed Defendant's mental health history. Nevertheless, there is no indication that Defendant's prior psychiatric record informed any of these medical expert's conclusions regarding Defendant's present mental state. Given the timing and focus of Defendant's expert reports, it is unclear to what extent, if any, Defendant's expert witnesses would be able to reliably testify as to Defendant's state of mind at the time of the alleged crimes.

11

## C. Limits of Psychiatric Testimony Regarding Defendant's *Mens Rea*

Even assuming, *arguendo*, that Defendant's medical experts are able to diagnose Defendant with a recognized mental defect and to testify about how this defect impacted Defendant's state of mind at the time of the alleged offense, the psychiatric testimony would still be inadmissible under the Insanity Defense Reform Act of 1984 ("IDRA").

In enacting the IDRA, Congress codified the federal standard for an insanity defense and substantially limited the use of mental disease or defect evidence. The IDRA provides in pertinent part that:

> It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C.A. § 17(a).

The Fourth Circuit has commented *in dicta* that the IDRA allows evidence of mental disease for purposes beyond proving the affirmative defense of insanity. *See United States v. Worrell*, 313 F.3d 867, 873 (4th Cir. 2002); *United States v. Robinson*, 804 F.Supp. 830, 831 (W.D. Va. 1992). For instance, the *Worrell* court held that the IDRA permits a defendant who is not pursuing an insanity defense—as is the case here—to use evidence of a mental disease or defect to negate specific intent. *See Worrell*, 313 F.3d at 873 ("[D]espite IDRA, psychiatric testimony regarding a defendant's mental condition can still be used in appropriate circumstances to disprove specific intent for specific intent crimes."); *Robinson*, 804 F.Supp. at 831 (listing cases).

Nonetheless, under the IDRA, a defendant is still subject to certain limitations regarding psychiatric evidence of a mental disease or defect. The IDRA prohibits a defense concerning

"any form of legal excuse based upon one's lack of volitional control" including "a diminished ability or failure to reflect adequately upon the consequences or nature of one's actions." *Worrell*, 313 F.3d at 872 (quoting *United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir. 1990)). Similarly, a defendant cannot introduce psychiatric evidence to excuse a defendant's conduct. *See Worrell*, 313 F.3d at 873–74; *United States v. Hood*, No. 87-5670, 1988 WL 96130, at *1 (C.A.4 (Md.) Aug. 3, 1988) (finding no error in district court's decision to exclude psychiatrist's testimony that defendant lacked intent to steal, since testimony amounted to nothing more than diminished capacity evidence); *Robinson*, 804 F.Supp. at 832 ("[T]he evidence of mental abnormality, apart from establishing an insanity defense, may only be admitted in the very narrow circumstances where the trial judge concludes that it will negate specific intent or other *mens rea*.").

In short, the Fourth Circuit has distinguished between psychiatric evidence that "justif[ies] or excuse[s] conduct that is *otherwise* criminal" from psychiatric evidence that "aids the trier in determining the defendant's specific state of mind with regard to the actions she took at the time the charged offense was committed, . . . evidence that negates an essential element of the government's *prima facie* case." *Worrell*, 313 F.3d at 873 (quoting *Cameron*, 907 F.2d at 1063, 1065). Evidence that a defendant lacks the capacity to form the requisite *mens rea* is inadmissible at trial, while evidence that a defendant did not possess the requisite *mens rea* at the time of the offense is admissible. *See, e.g.*, *United States v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1996); *Cameron*, 907 F.2d at 1066.

This distinction is supported by the IDRA's legislative history, which emphasizes Congress's intent that the "insanity defense is not improperly resurrected in the guise of showing some other affirmative defense, such as that the defendant had a 'diminished responsibility' or

some similarly asserted state of mind which would serve to excuse the offense . . . ." S.Rep. No. 25, 98th Congr., 2d Sess. 229 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3411. The *Robinson* court further elaborated that "the defenses that Congress intended to preclude usually permit exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection; however, these matters do not strictly negate *mens rea*." *Robinson*, 804 F.Supp. at 832.

The Fourth, Eleventh, and Third Circuits have all referred to *United States v. Staggs*, 553 F.2d 1073 (7th Cir. 1977)[1] as an example of the appropriate use of psychiatric evidence to negate specific intent. *See Worrell*, 313 F.3d at 873–74, *Cameron*, 907 F.2d at 1067; *United States v. Pohlot*, 827 F.2d 889, 897 (3rd Cir. 1987). In *Staggs*, the court reversed the district court's exclusion of psychiatric evidence indicating that the defendant—who was charged with threatening to shoot a policeman—suffered from a mental condition that made it highly unlikely that he would make such a threat. *See United States v. Staggs*, 553 F.2d 1073 (7th Cir. 1977). Thus, the psychiatric evidence in *Staggs* was admissible because it was offered to show that the defendant did not commit the crime, not that he could not help it. *See Worrell*, 313 F.3d at 874.

It is noteworthy that psychiatric evidence introduced for purposes beyond proving the defense of insanity is rarely admissible. *See, e.g., Worrell*, 313 F.3d at 873 ("We confess we have difficulty envisioning many scenarios in which a defendant could introduce psychiatric evidence, short of insanity, that was not simply diminished capacity evidence or some other form of justification in disguise."); *United States v. Moran*, Nos. 90-5024 and 90-5025, 1991 WL 125461, at *3 (C.A.4 (Md.) Oct. 24, 1991) ("[T]he circumstances for [] proper admission [of

---

[1] *Staggs* was overruled on grounds unrelated to the issue at hand. *See United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir. 1998) (explaining that the Seventh Circuit no longer follows *Staggs's* conclusion that 18 U.S.C.A. § 111 is a general intent crime).

psychiatric evidence to negate specific intent] will be quite rare."); *Robinson*, 804 F.Supp. at 832 ("[E]vidence of mental abnormality, apart from establishing an insanity defense, may only be admitted in the very narrow circumstances where the trial judge concludes that it will negate specific intent or other *mens rea*."); *Pohlot*, 827 F.2d at 900 ("Only in the rare case . . . will even a legally insane defendant actually lack the requisite *mens rea* purely because of mental defect.").

Since psychiatric testimony for purposes beyond proving the defense of insanity is permissible only in very narrow circumstances, district courts must "examine such psychiatric evidence carefully to ascertain whether it would, if believed, 'support a legally acceptable theory of lack of *mens rea*.'" *Moran*, 1991 WL 125461, at *3 (quoting *Cameron*, 907 F.2d at 1067). Careful review by district courts is essential since "psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury from focusing on the actual presence or absence of *mens rea*, and (3) 'may easily slide into wider usage that opens up the jury to theories of defense more akin to justification' . . . ." *Cameron*, 907 F.2d at 1067 (quoting *Pohlot*, 872 F.2d at 904–06).

In the present case, Defendant does not raise an insanity defense. Instead, Defendant argues that the expert testimony is probative of whether he could have formed the requisite *mens rea* at the time of the offense, namely knowledge and intent. Yet, nothing in Defendant's medical reports supports Defendant's assertion that he did not know he was filing a false lien and false tax returns in violation of federal statutes. The reports do not indicate to what extent, if any, Defendant's medical experts can reliably opine as to his *mens rea*; nor do the reports comment on Defendant's knowledge of the law at the time he allegedly filed the false lien and false claims. In fact, Dr. Restak is the only noticed expert to arguably address Defendant's

mental state at the time of these alleged offenses. According to Dr. Restak's report, Defendant told him that the current charges "had to do with a redemption process" and that "he feels that he did nothing wrong and that he did not steal anything." Report from Dr. Restak at 1–2. Nevertheless, such iterations of Defendant's philosophy are completely independent from Dr. Restak's medical conclusions regarding the Defendant. Expert testimony is not required to introduce these facts during trial; Defendant is free to call character witnesses or take the stand himself.

Moreover, defendant asserts that the medical testimonies are not intended to be an excuse or justification for the charged offenses. Nonetheless, the experts' conclusions about the Defendant—that he has a rigid personality style, mental inflexibility, certainty in the righteousness of his behavior, and an unwillingness to consider alternative explanations—do not negate the requisite *mens rea*. Rather such observations fall into the category of defenses Congress intended to preclude when enacting the IDRA. Defendant's medical experts do nothing more than reveal Defendant's "inability or failure to engage in normal reflection," *Robinson*, 804 F.Supp. at 832, and/or his "diminished ability or failure to reflect adequately upon the consequences or nature of [his] actions," *Worrell*, 313 F.3d at 872. The Fourth Circuit has consistently held that such excuses are justifications are inadmissible under the IDRA.

## **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the Government's Motion *in Limine* to Exclude Defendant's Noticed Expert Witness Testimony.

|   November 17, 2011   |   /s/   |
|---|---|
| Date | Alexander Williams, Jr.<br>United States District Judge |